**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LUIS ORTIZ HERNANDEZ, | § | |
| *Plaintiff* | § | |
| | § | |
| -vs- | § | SA-22-CV-01069-XR |
| | § | |
| RUTH SARAI ERAZO, | § | |
| *Defendant* | § | |
| | § | |

## AMENDED AND RESTATED ORDER

Before the Court in this Hague Convention case is Petitioner Luis Ortiz Hernandez's Original Petition and Request for Return of Minor Child to Petitioner (ECF No. 5), in which Petitioner seeks the return of his two-year-old child, M.S.O., to Mexico. After careful consideration of the Petition, Respondent Ruth Sarai Erazo's Answer (ECF No. 19), the arguments and evidence presented at the consolidated injunction and merits hearing held on January 5, 2023, and the supplemental briefing that followed (ECF Nos. 23, 24, 25, 27, 28), the Court issues the following amended and restated order.

## BACKGROUND

This case arises under the Convention on the Civil Aspects of International Child Abduction (the "Hague Convention" or "Convention"), Oct. 24, 1980, T.I.A.S. No. 11670, S. Treaty Doc. No. 99-11, and its implementing legislation, the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.* The Hague Conference on Private International Law adopted the Convention in 1980 to address the problem of international child abductions during domestic disputes, such as the one at issue in this case.

Petitioner Luis Ortiz Hernandez ("Ortiz") initiated this action to secure the return of his son, M.S.O. (the "Child"), who was allegedly removed from Mexico without Petitioner's consent

or acquiescence by the Child's mother, Respondent Ruth Sarai Erazo ("Erazo"), on October 9, 2021. ECF No. 5.

Ortiz commenced this action on September 29, 2022, seeking leave to proceed *in forma pauperis*. ECF No. 1. After his IFP motion was granted (ECF No. 4), Ortiz's Original Petition and Request for Return of Minor Child to Petitioner ("Petition") was filed on October 19, 2022 (ECF No. 5). On the same day, the Court entered an order granting Petitioner's *ex parte* motion for a temporary restraining order ("TRO") prohibiting Erazo, her agents, and all persons acting in concert with her from removing the Child from the geographic jurisdiction of this Court pending further order of this Court or another United States court or agency. ECF No. 6. The Court set Ortiz's request for a preliminary injunction for a hearing on October 31, 2022, and ordered Erazo to appear, with M.S.O., and show cause why the TRO should not be extended beyond its November 2, 2022 expiration date and why M.S.O. should not be returned to Mexico. *Id.* at 9. The Court extended the TRO twice—first, to allow additional time for service on Erazo and then, to allow Erazo additional time in which to respond to the Petition and prepare for the preliminary injunction hearing. *See* ECF No. 14; Text Order dated Nov. 11, 2022.

Erazo filed an answer to the Petition on December 27, 2022, asserting that the Child was not wrongfully removed because Petitioner had consented to—and even helped organize—M.S.O.'s removal to the United States. *See* ECF No. 19 ¶¶ 14–15. According to Erazo, she and Ortiz had arranged to move their family to the United States, with Erazo and M.S.O. crossing into the United States first, to be followed by Ortiz. Erazo's answer further asserts that the Child should not be returned to Mexico because the Petition was not filed in this case until over a year after M.S.O.'s removal and the Child is now well settled in his new environment. *Id.* ¶ 25.[1]

---

[1] Finally, Erazo alleges that the Child would face a grave risk of physical and psychological harm if returned to his previous residence in Mexico. *See id.* ¶ 26.

On January 5, 2023, the Court held a consolidated injunction and merits hearing at which Ortiz and Erazo appeared and presented arguments concerning the propriety of M.S.O.'s return to Mexico. *See* ECF No. 22; *see also* FED. R. CIV. P. 65(a); *John v. State of La. (Bd. of Trs. for State Colleges & Univs.)*, 757 F.2d 698, 704 (5th Cir. 1985). Petitioner appeared remotely at the hearing by videoconference. Erazo appeared in-person, along with one supporting witness: Erazo's aunt, Telma Marilu Chinchilla Reyes, with whom Erazo and the Child have been living since their arrival in the United States. The parties subsequently filed letter briefs in support of their respective positions. *See* ECF Nos. 23, 25, and 27.

## DISCUSSION

I.      **Findings of Fact**

1.      The Child was born in Tequixquiac, Mexico on January 25, 2021, and, until his removal to the United States, lived with his parents, who have never married, at Petitioner's family residence in Mexico City, Mexico.

2.      Ortiz is a Mexican citizen who lived in the United States for several years until he was deported in 2016, when, after overstaying his visa, he was convicted on his fourth charge for driving under the influence. ECF No. 26, Hr'g Tr. at 9:7–19.

3.      Before he was deported, Ortiz fathered a son he has never met, who remains in the United States to this day. *Id.* at 9:11–16.

4.      Ortiz met Erazo in August 2019, while they were both working in Cancun, and the two began dating. *Id.* at 10:20–25.

5.      Erazo, who is originally from Honduras, lived as an undocumented immigrant in Mexico. *Id.* at 11:9–25. Ortiz knew from the beginning of their courtship, however, that Erazo's "ultimate intention" was to live in the United States. *Id.* at 11:14–15, 73:11–13.

6.      Ortiz and Erazo became engaged on December 12, 2019. *Id.* at 10:4–5. Ortiz testified that he stopped drinking on the same day. *Id.*

7.      In the spring of 2020, both Ortiz and Erazo lost their jobs in Cancun as a result of the COVID-19 pandemic. *Id.* at 14:12–20. In June, they learned that Erazo was pregnant with M.S.O. and decided to move to Mexico City to live with Ortiz's parents. *Id.* at 14:23–15:8.

8.      Shortly after the couple moved to Mexico City, Ortiz began working at an automobile repair shop near his parents' home, where he works to this day. *Id.* at 16:15–15; 18:10–25. Erazo was unable to work during her pregnancy, but began working at a restaurant at some point after M.S.O. was born on January 25, 2021. *See id.* at 19:1–5, 58:12–13.

9.      At the hearing, Ortiz and Erazo presented competing accounts of their time in Mexico City. Ortiz described living in a large house in a safe neighborhood, with close family and elementary school within walking distance. *See generally id.* at 15:19–17:15. Erazo, on the other hand, testified that she was not free to go out at night because the area was too dangerous. *Id.* at 91:11–15.

10.     Their testimony concerning Erazo's desire to live in the United States was also conflicting. According to Ortiz, Erazo stopped talking about moving to the United States after they became engaged and learned that she was pregnant, *see id.* at 14:9–11, 24:15–16, 41:3–4, because Ortiz was barred from re-entering the United States, *id.* at 24:8–12. Erazo, meanwhile, testified that M.S.O.'s birth brought new urgency to their plans to leave Mexico—in order to provide a better future for him—and that they had agreed to move to the United States approximately two months before she crossed the border. *See id.* at 75:2–10, 92:5–10. Erazo and M.S.O. would leave first, to be followed by Ortiz once Erazo had secured an apartment in San Antonio. *See id.* at 84:11–85:7.

11.     Both parties agreed that on October 3, 2021, Hernandez, Erazo, and M.S.O. left for Monterrey, Nuevo Leon, Mexico, where they stayed for several days with Ortiz's aunt. *See id.* at 24:21–23, 76:5–8.

12.     According to Ortiz, Erazo asked to take a vacation to Monterrey in order to visit his aunt. *Id.* at 23:23–24. Although Ortiz had not seen his aunt since returning to Mexico in 2016, *id.* at 42:18–43:6, he testified that Erazo had developed a close relationship over messages and phone calls, *id.* at 24:5–7. Erazo, on the other hand, testified that she had never spoken to Ortiz's aunt before she arrived in Monterrey on October 4, 2021. *Id.* at 11–15.

13.     Ortiz stated that Erazo insisted for months that they go to Monterrey, but that he was reluctant to leave work. *Id.* at 23:24–24:2, 43:10–11. In addition, Ortiz had to obtain a Mexican birth certificate for M.S.O. before they could visit Ortiz's aunt because they expected to be stopped by immigration on the approximately 20-hour bus ride north to Monterrey.[2] *Id.* at 24:1–2, 45:18–20, 56:10–14. The birth certificate was processed on September 24, 2021. *Id.* at 56:23–25. Less than two weeks later, the family boarded a bus to Monterrey, where they arrived on October 4, 2021. *Id.* at 24:21–23, 76:9–11.

14.     It is undisputed that Ortiz returned to Mexico City alone only two days later, on October 6, 2021, but the parties presented opposing testimony about the reason for his departure. Ortiz testified that he was suddenly called back to work because his employer "had some work pending for a company, a beer company, and we had to send radiators and coolers for the trucks." *Id.* at 44:23–25. He had to return because "[i]t was a two-person job. One of the two had to be working while the other one was taking care of sending the materials and going to the bank." *Id.*

---

[2] The family took a bus rather than flying due to Erazo's undocumented status in Mexico. *See* Hr'g Tr. at 75:19–24.

at 45:2–5. According to Erazo, Ortiz returned to Mexico City because the purpose of their journey had been fulfilled—Erazo and M.S.O. had already left for the United States.

15.     Specifically, Erazo testified that she and M.S.O. met with a Honduran coyote on October 5, 2021, the day after the family's arrival in Monterrey. *Id.* at 77:17–19. Erazo testified that she had paid the coyote approximately $2,000, which she has borrowed from her aunt, Telma Marilu Chinchilla Reyes, to facilitate the border crossing. *Id.* at 64:5–19. Two people came to pick them up, and Ortiz helped them into the car before they left and eventually boarded a boat that crossed into the United States. *Id.* at 78:1–5. Erazo testified that Ortiz had purchased a cell phone for her to ensure that she "would have a good phone for the trip," and that she remained in contact with Ortiz on a daily basis throughout the trip. *Id.* at 78:13–25, 79:17–20.

16.     According to Erazo, she and M.S.O. surrendered to the United States Border Patrol on October 11, 2021, and were transported by bus to San Antonio. *Id.* at 64:24–65:18, 79:17–20. After being held in Border Patrol custody for approximately two days, Erazo and M.S.O. were released to her aunt, Telma Marilu Chinchilla Reyes. *Id.* at 65:19–66:2.

17.     Erazo testified that her relationship with Ortiz began to deteriorate shortly after she entered the United States because Ortiz immediately started drinking again. *Id.* at 85:9–11, 25–16. He would call her while he was drinking and say things that offended her. *Id.*

18.     Although the relationship was in bad shape, Erazo stated that, for the first two weeks after her arrival in the United States, she would have welcomed Ortiz to rejoin the family because she did not want her child to grow up without a father. *Id.* at 85:22–23. On the evening of October 31, 2022, however, Erazo ended her relationship with Ortiz permanently, after she saw another woman in a video call with Ortiz and confirmed that he was being unfaithful. *Id.* at 70:15–22.

19.     Erazo testified that she has been working in construction clean-up since three days after her arrival in San Antonio, and lives in her own apartment with M.S.O., who attends day care six days a week while she works. *Id.* at 67:19–68:13.

## II.     Conclusions of Law

### A.     The Hague Convention and ICARA

The Hague Convention seeks "to secure the prompt return of children wrongfully removed to or retained in any Contracting State," and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." ECF No. 3-1, Treaty Doc., Art. 1. It accomplishes these objectives through the return remedy. *Sanchez v. R.G.L.*, 761 F.3d 495, 503 (5th Cir. 2014) (citing *Abbott v. Abbott*, 130 S. Ct. 1983 (2010)). The Convention is based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence. *Abbott*, 130 S. Ct. at 1995. Ordering a return remedy does not alter the exiting allocation of custody rights, but does allow the courts of the home country to decide what is in the child's best interests. *Id.* As the Supreme Court explained in *Abbott*:

> The Convention's central operating feature is the return remedy. When a child under the age of 16 has been wrongfully removed or retained, the country to which the child has been brought must "order the return of the child forthwith," unless certain exceptions apply. A removal is "wrongful" where the child was removed in violation of "rights of custody." The Convention defines "rights of custody" to "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." A return remedy does not alter the pre-abduction allocation of custody rights but leaves custodial decisions to the courts of the country of habitual residence.

*Id.* at 1989 (citations omitted). "By focusing on the child's return, the Convention seeks to 'restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court.'" *Sanchez*, 761 F.3d at 503 (citing *England v. England*, 234 F.3d 268, 271 (5th

Cir. 2000)). The return remedy determines the country in which the custody decision is to be made; it does not make that decision. *Id.*

ICARA implements the Hague Convention by authorizing a person who seeks a child's return to file a petition in state or federal court and directing courts to "decide the case in accordance with the Convention." 22 U.S.C. § 9003(a), (b), (d). Suit should be filed in a court in the jurisdiction where the child is physically located. *Id.* (b). If the child in question has been "wrongfully removed or retained within the meaning of the Convention," ICARA provides that the child shall be "promptly returned," unless one of a number of narrow exceptions applies. *Id.* § 9001.

The retention of a child is wrongful if the petitioner proves by a preponderance of the evidence that: (1) the child was retained somewhere other than the child's habitual residence; (2) the retention was in breach of the petitioner's rights of custody under the laws of the country of habitual residence; and (3) the petitioner was exercising those rights at the time of retention. Hague Convention arts. 3, 12.

The Hague Convention also provides that if the child's removal or retention is deemed wrongful and "the date of the commencement of the proceedings" before the court where the child is located is "less than one year" from the date of the removal or retention, the court "shall order the return of the child forthwith." Hague Convention art. 12. Even if it has been longer than one year, the court "shall also order the return of the child[ ], unless it is demonstrated that the child is now settled in its new environment." *Id.* "ICARA requires the abducting parent to establish by a preponderance of the evidence that Article 12's exception to return applies." *Lozano v. Montoya Alvarez*, 572 U.S. 1, 6 (2014) (citing 42 U.S.C. § 11603(e)(2)(B)).

Respondents in Hague Convention cases may assert "several narrow affirmative defenses to wrongful retention." *Larbie v. Larbie*, 690 F.3d 295, 308 (5th Cir. 2012). Specifically, they may argue that (1) return of the child would pose a grave risk of physical or psychological harm, (2) return would violate the returning country's fundamental principles relating to the protection of human rights and fundamental freedoms, (3) judicial proceedings were commenced at least one year after the date of retention and the child is now settled into the new environment, (4) the child has reached a sufficient age and level of maturity and objects to return, and/or (5) the petitioner seeking return of the child had consented to or subsequently acquiesced to the removal or retention. *Gallardo v. Orozco*, 954 F. Supp. 2d 555, 575 (W.D. Tex. 2013).

### B.     Whether M.S.O. was wrongfully removed from Mexico

Article 3 of the Convention provides that removal is "wrongful" if it "is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal."

The Hague Convention does not define the term "habitual residence." *Larbie v. Larbie*, 690 F.3d 295, 310 (5th Cir. 2012). "The inquiry into a child's habitual residence is not formulaic; rather it is a fact-intensive determination that necessarily varies with the circumstances of each case." *Id.* (quoting *Whiting v. Krassner*, 391 F.3d 540, 546 (3d Cir. 2004)). The Supreme Court held in *Monasky v. Taglieri* that "a child's habitual residence depends on the totality of the circumstances specific to the case." 140 S. Ct. 719, 723 (2020). "Because children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers, the intentions and circumstances of caregiving parents are relevant considerations. No single fact, however, is dispositive across all cases." *Id.* at 727.

The parties do not appear to dispute that, at the time of his removal, the Child's habitual country of residence was Mexico. Accordingly, the rights of custody must be determined by the application of the laws of the Republic of Mexico. *See Bernal v. Gonzalez*, 923 F. Supp. 2d 907, 918 (W.D. Tex. 2012). Federal Courts have recognized that, absent a court order saying otherwise, Mexican law grants unmarried fathers a right of custody known as *patria potestas*. *See Sierra v. Tapasco*, No. 4:15-CV-00640, 2016 WL 5402933, at *7 (S.D. Tex. Sept. 28, 2016). Courts have ruled that this law affords a right protected by the Hague Convention. *Id.*; *Ortiz v. Cantu*, No. CIV.A. H-09-2913, 2009 WL 8543610, at *3 (S.D. Tex. Dec. 15, 2009) (citing *Whallon v. Lynn*, 230 F.3d 450, 459 (1st Cir. 2000)).

Under Mexican law, Ortiz, as the child's father, has the kind of custody rights protected by the Convention under the doctrine of *patria potestas*. *Id.* At the time of the Child's removal from Mexico, he and Erazo lived together and jointly exercised those custody rights. ECF No. 5 ¶ 17. Thus, at the time of the removal, Ortiz was exercising custodial rights over the Child, in the Child's habitual residence in Mexico, within the ambit of the Hague Convention. Nonetheless, Erazo maintains that the Child should remain in the United States because Ortiz consented to his removal. *See* ECF No. 19 ¶¶ 6, 10, 13–15. Indeed, Erazo testified that Ortiz eventually planned to join his family in the United States. Hr'g Tr. at 75:2–10, 92:5–10, 84:11–85:7.

### C.    Whether Petitioner consented to M.S.O.'s permanent removal

Under Article 13(a), the consent defense involves Ortiz's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention. *Larbie*, 690 F.3d at 308 (citing *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005)). The respondent must prove the defense of consent or acquiescence to the removal or retention by a preponderance of the evidence. 42 U.S.C. § 11603(e)(2). The affirmative

defenses are narrowly construed to effectuate the purposes of the Convention, and even finding an exception under article 13 does not automatically preclude an order of return. *See* Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,509 (Mar. 26, 1986); *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996). Generally, courts "'liberally find'" that rights of custody have been exercised unless evidence demonstrates "'acts that constitute clear and unequivocal abandonment of the child.'" *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 344–45 (5th Cir. 2004) (citation omitted).

Although case law construing the consent defense under the Convention is limited, the Fifth Circuit has identified some general principles based on the few reported cases. *Id.* "The focus of inquiry is the petitioner's subjective intent, as evinced by the petitioner's statements or conduct, which can be rather informal." *Id.* (citations and quotation marks omitted) (citing *Baxter*, 423 F.3d at 371, and *Nicolson v. Pappalardo*, 605 F.3d 100, 105 (1st Cir. 2010)). "In examining a consent defense, it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country. The nature and scope of the petitioner's consent, and any conditions or limitations, should be taken into account." *Id.* (citing *Baxter*, 423 F.3d at 371).

Several cases from other circuits have rejected respondents' consent defense where it appeared that the consent was subject to certain conditions, including, for example, the petitioner's ability to join his or her family in the United States on a permanent basis. *See Hofmann v. Sender*, 716 F.3d 282 (2d Cir. 2013) (concluding that the consent defense was inapplicable where the father's initial consent to the children's removal from Canada to the United States was conditioned on his accompanying them and residing in the United States as a family with his wife and children—a condition that was not met); *Mota v. Castillo*, 692 F.3d 108 (2d Cir. 2012) (holding

that a mother's consent to her daughter's removal from Mexico to the United States was conditioned upon her own ability to join the responding father and the child in New York and subsequently annulled by the failure of that condition, after the mother failed to cross the border on multiple occasions); *Baxter*, 423 F.3d at 363 (reversing district court's ruling as to father's consent because his intent in agreeing to the child's stay at his grandmother's house in Delaware for a few months while the family figured out its next move fell short of the standard for finding consent under Article 13(a)).

Here, the Court is not convinced by Ortiz's testimony that M.S.O. was removed from Mexico without his permission. Based on the parties' testimony at trial, the Court concludes that Ortiz did consent to M.S.O.'s removal from Mexico but that removal was conditioned on Ortiz's ability to rejoin his family in the United States or, at the very least, on his continued relationship with Erazo. *See Baxter*, 423 F.3d at 373 ("Mrs. Baxter's decision [to end her marriage and remain in Delaware] represented a change in plan from what she and Mr. Baxter had agreed upon before departing to Delaware. It was clear error for the District Court to find otherwise."); *Cocom v. Timofeev*, No. 2:18-cv-002247, 2019 WL 76773, at *13–14 (D.S.C. Jan. 2, 2019) (condition that respondent file a petition on behalf of petitioner for immigration to the United States after respondent's move to the United States was not met); *Chumachenko v. Belan*, No. 18-CV-9728-LTS, 2018 WL 6437062, at *8 (S.D.N.Y. Dec. 7, 2018) (evidence established that parties never shared an intent to permanently move the children to the United States outside the confines of an intact family unit. Respondent and his mother's self-serving, inconsistent testimony were not sufficient to establish consent defense). Erazo has failed to establish by a preponderance of the evidence that Ortiz clearly and unequivocally intended for M.S.O. to remain in the United States

regardless of his relationship with Erazo or his ability to join Erazo and M.S.O. in Texas. Accordingly, Erazo has failed to establish the affirmative defense of consent.

###     D.      Whether the Petition was timely filed

M.S.O. was removed from Mexico on October 9, 2021. Ortiz filed his IFP application—which included a copy of his proposed Petition—on September 29, 2022. *See* ECF No. 1. The Petition was not actually filed until October 19, 2022, after the Magistrate Judge granted Ortiz's IFP motion. *See* ECF Nos. 4, 5. Accordingly, Erazo argues that the Petition was not filed in this case until over a year after M.S.O.'s removal, and that M.S.O. should remain in the United States because he is now well settled in his new environment. *Id.* ¶ 25.

For statute of limitations purposes, the Fifth Circuit has held that a complaint in an action in which leave to proceed IFP is requested is generally deemed to have been filed on the day the motion is received by the clerk, or on the date the complaint is lodged. *See Ynclan v. Dep't of Air Force*, 943 F.2d 1388, 1392 (5th Cir. 1991) (concluding that the "delay by the clerk in stamping a complaint "filed" due to the pendency of a motion to proceed IFP does not jeopardize the timeliness of the plaintiff's commencement of suit.").[3] However, in *Lozano v. Montoya Alvarez*, the Supreme Court concluded that "[t]he American presumption that federal statutes of limitations can be equitably tolled . . . does not apply to this multilateral treaty" or its implementing legislation. 572 U.S. 1, 13 (2014). The Court also held that the Hague Convention's one-year rule was not a statute-of-limitations, noting that:

---

[3] *Hernandez v. Aldridge*, 902 F.2d 386, 388 (5th Cir. 1990), *cert. denied*, 498 U.S. 1086 (1991); *Martin v. Demma*, 831 F.2d 69 (5th Cir. 1987) ("Clerical delay in the formal filing of this in forma pauperis complaint should not affect the operative event, that is, the receipt of the complaint by the court."); *see also McClelland v. Herlitz, Inc.*, 704 F. Supp. 749, 751 (N.D. Tex. 1989) (noting that "the operative date for limitations purposes is the date the clerk of court initially receives the complaint and the request for leave to proceed IFP"); *see also Smith v. Ouzts*, 629 F. Supp. 1001, 1001 (S.D. Miss. 1986) ("[S]ince the Plaintiff had no control over when the Magistrate would allow his Complaint to be filed, the operable date for the purposes of the statute of limitation is the date of receipt by the Clerk of the Court.").

> [E]xpiration of the 1–year period in Article 12 does not eliminate the remedy the
> Convention affords the left-behind parent—namely, the return of the child. Before
> one year has elapsed, Article 12 provides that the court "shall order the return of
> the child forthwith." But even after that period has expired, the court "shall also
> order the return of the child, unless it is demonstrated that the child is now settled."
> Ibid. The continued availability of the return remedy after one year preserves the
> possibility of relief for the left-behind parent and prevents repose for the abducting
> parent. Rather than establishing any certainty about the respective rights of the
> parties, the expiration of the 1–year period opens the door to consideration of a third
> party's interests, i.e., the child's interest in settlement. Because that is not the sort
> of interest addressed by a statute of limitations, we decline to treat the 1–year period
> as a statute of limitations.

*Id.* at 14–15.

Given the Court's reasoning in *Lozano*, the Court concludes that the petition was filed after the one-year period contemplated under the Hague Convention and ICARA and thus proceeds to Erazo's affirmative defense that M.S.O. is now well-settled in the United States.

### E.        Whether the Child is well-settled in his new environment

Erazo's answer asserts that the Child should not be returned to Mexico because he has lived in the United States for over a year and is well-settled in his new environment. *See* ECF No. 19 ¶ 25. In determining whether a wrongfully-removed child is well-settled in United States, and thus may not be returned to his or her country of habitual residence, courts in the Fifth Circuit consider: (1) the child's age; (2) stability and duration of the child's residence in new environment; (3) whether the child attends school or day care consistently; (4) whether the child has friends and relatives in the new area; (5) the child's participation in community or extracurricular activities; (6) respondent's employment and financial stability; and (7) the immigration status of respondent and child. *Hernandez v. Garcia Pena*, 820 F.3d 782, 788 (5th Cir. 2016). With respect to the last factor, the Fifth Circuit has joined the Second and Ninth Circuits in concluding that immigration status is neither dispositive nor subject to categorical rules, but instead is one relevant factor in a multifactor test:

> Like the other factors . . . immigration status should not be considered in the abstract. In other words, proper application of the framework does not assign automatic treatment to any particular type of immigration status. Instead, we agree with the Second Circuit that an individualized, fact-specific inquiry is necessary in every case.

*Id.* at 788–89 (citing *Lozano v. Alvarez*, 697 F.3d 41, 53 (2d Cir. 2012) and *In re B. Del C.S.B.*, 559 F.3d 999, 1008 (9th Cir.2009)).

Giving due consideration to immigration status and the other relevant factors listed above, the Court concludes that M.S.O. has not formed significant connections to his new environment. First, the Court considers the child's age. Here, M.S.O. is barely two years old. In other words, he is a very young child not able to form the same level of attachments and connections to a new environment as an older child. *See Hernandez v. Garcia Pena*, 820 F.3d 782, 789 (5th Cir. 2016) (citing *Lozano*, 697 F.3d at 48 (noting that the district court found the five-year-old child "too young to form certain types of connections")). The second factor is the stability and duration of the child's new residence. Although M.S.O.'s residence in his mother's apartment is stable, he has lived in San Antonio less than a year. The third and fourth factors consider whether the child attends school consistently and has friends and relatives in the new environment. Erazo testified that M.S.O. attends day care six days a week while she is working. Hr'g Tr. at 68:12–13. The fifth factor—the Child's participation in community activities—does not appear to be relevant here. As to the sixth factor, Erazo's economic and employment stability, Erazo testified that she has been employed in construction clean-up since the third day after her arrival in San Antonio and works six days a week. *Id.* at 67:19–68:13. Finally, the seventh factor to consider is immigration status. Erazo's immigration status is uncertain. She testified that she has not filed a petition for asylum but that her immigration status  in the United States is still pending. *Id.* at 66:3–9. Despite Erazo's

admirable efforts to create a stable home environment for M.S.O. in Texas, it is not at all clear to the Court that she will be able to remain in the United States on a long-term or permanent basis.

Balancing the above factors, the Court is not persuaded that M.S.O. has formed significant connections to his new environment and thus concludes that he is not well-settled under the Convention such that he should remain in the United States.

### F.     Whether the Child's return would pose a grave risk of harm

Without explanation, Erazo's answer further alleges that the Child would face a grave risk of physical and psychological harm if returned to his previous residence in Mexico. *See* ECF No. 19 ¶ 26. A party opposing a child's return must prove the existence of such grave risk by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A). The alleged harm "must be a great deal more than minimal" and "greater than would normally be expected on taking a child away from one parent and passing him to another." *Madrigal v. Tellez*, 848 F.3d 669, 676 (5th Cir. 2017) (citing *Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000)). Erazo did not present any evidence or arguments that  M.S.O.'s return would pose a grave risk of harm and, accordingly, has failed to establish this affirmative defense.

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that the relief requested in the Petition (ECF No. 5), is **GRANTED**. M.S.O. is to be promptly and safely returned to Ortiz's custody in Mexico.

To be clear, nothing in this order should be read to constitute a final or permanent award of physical or legal custody over M.S.O., which is a determination that must be made in Mexico upon M.S.O.'s return. *Abbott*, 560 U.S. at 8–9; *Sanchez*, 761 F.3d at 503. Rather, by directing that M.S.O. be returned to Ortiz's custody in Mexico, this Court merely seeks to restore the pre-abduction status quo. *England*, 234 F.3d at 271. The Court has concluded that, at the time of his

wrongful removal, M.S.O. was living in Mexico with Ortiz, who was exercising custody under Mexican law pursuant to the doctrine of under the doctrine of *patria potestas*. Permitting M.S.O. to be returned to Mexico in the custody of anyone other than Ortiz would not be restoring the status quo but making precisely the kind of custody determination that the Hague Convention forbids.

        **IT IS FURTHER ORDERED** that within 30 days after M.S.O. has been returned to Ortiz, Ortiz may submit a motion for costs and fees, accompanied by a final list of his incurred expenses, including attorneys' fees, court costs, and transportation costs related to the return of M.S.O. *See* 42 U.S.C. § 11607(b)(3). Should Ortiz file such a motion, Erazo may respond within 14 days or seek an extension of time in which to do so.

        It is so **ORDERED**.

        **SIGNED** this 4th day of April, 2023.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE